UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**DONALD S. YARBROUGH,**

     **Petitioner,**

**v.**                                                    **Case No. 8:15-cv-1558-MSS-AEP**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

     **Respondent.**

_____/

# O R D E R

Yarbrough petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court conviction for sexual battery. (Doc. 1) After the Respondent asserted the petition was time-barred (Docs. 9 and 18), the Court determined that the petition is timely and directed the Respondent to respond to the merits of the claims. (Doc. 34) The Respondent responds and submits the relevant state court record (Doc. 37), and Yarbrough replies. (Doc. 51) After reviewing the pleadings and the state court record, the Court **DENIES** the petition.

## PROCEDURAL HISTORY

A jury found Yarbrough guilty of sexual battery on a minor (Doc. 37-4 at 2), and the trial court sentenced Yarbrough to life without parole. (Doc. 37-4 at 4–8) Yarbrough appealed, and the state appellate court affirmed in a decision without a written opinion. (Doc. 37-4 at 87) The post-conviction court denied Yarbrough relief after an evidentiary hearing (Docs. 37-5 at 21–29, 278–90 and 37-6 at 189–96, 339–41), and the state appellate court affirmed in a decision without a written opinion. (Doc. 37-6 at 416) Yarbrough's federal petition follows.

1

## FACTS

A.R., his father, and his sister lived with Yarbrough, Yarbrough's grandmother, and another couple. (Doc. 37-3 at 62–63) At the time, A.R. was in the fourth grade. (Doc. 37-3 at 63) The small home had three bedrooms. Yarbrough slept in one bedroom, Yarbrough's grandmother slept in another bedroom, and the couple slept in the third bedroom. (Doc. 37-3 at 63–64) A.R. and his family slept in the living room. (Doc. 37-3 at 64) One evening, A.R. heard his father and Yarbrough arguing about money. (Doc. 37-3 at 64–65, 122) A.R. left with his father but returned because his father had forgotten his medicine at the home. (Doc. 37-3 at 65–66) A.R. knocked on the front door, and Yarbrough answered. Yarbrough told A.R. to go inside while Yarbrough spoke with A.R.'s father outside. (Doc. 37-3 at 67) A.R. heard Yarbrough tell his father, "I'm sorry." (Doc. 37-3 at 67–68)

A.R. fell asleep on a chair in the living room, felt someone carry him to Yarbrough's bedroom, and fell back asleep. (Doc. 37-3 at 68–70) A.R. slept in a pair of tan shorts, which belonged to Yarbrough, without any underwear. (Doc. 37-3 at 71, 79, 152) A.R. woke up, saw the tan shorts pulled down, and felt his buttocks exposed. (Doc. 37-3 at 71–72) A.R. felt Yarbrough's penis in his buttocks, which caused A.R. pain, and felt Yarbrough's body on top of him. (Doc. 37-3 at 72–75, 161) When Yarbrough stopped moving "up and down," he stood up and said, "Oh, shit, I thought you were someone else, like my girl." (Doc. 37-3 at 161, 166, 181) A.R. went to the bathroom, wiped his buttocks, and saw "whitish yellowish stuff." (Doc. 37-3 at 76)

A.R. went outside to wake up his father who was asleep in his car, but his father would not wake up. (Doc. 37-3 at 77–78) A.R. told his father the next morning what happened. (Doc. 37-3 at 78) A.R.'s father and A.R. went to get breakfast and met with a police officer.

2

(Doc. 37-3 at 78) Later that day, A.R.'s father told A.R. to change into another pair of shorts and he placed the tan shorts in a plastic bag. (Doc. 37-3 at 81–82) Early the next morning, A.R.'s father took A.R. to the hospital. (Doc. 37-3 at 82, 242–43, 366)

A doctor examined A.R., did not observe any physical injury, and swabbed inside A.R.'s anal canal. (Doc. 37-3 at 259–61, 371–75, 392–93) A nurse, who was present for the examination, also swabbed the outside of A.R.'s anus and described his anus as a "little red" and "irritated." (Doc. 37-3 at 252–53, 256, 280–83, 292) A pediatrician with the child protection team, who did not examine A.R. but reviewed A.R.'s medical records, opined that "the medical assessment confirms the diagnosis of child sexual abuse due to a detailed credible history of sexual assault with a normal exam." (Doc. 37-3 at 197–98) The pediatrician confirmed that the examination of A.R. did not reveal medical evidence of sexual abuse but explained that only forty to fifty percent of children who suffer sexual abuse by anal penetration show abnormal medical findings because the rectum is elastic. (Doc. 37-3 at 198–202)

A crime lab analyst identified semen on the swabs from inside A.R.'s anal canal and on the tan shorts but did not identify semen on the swabs from outside A.R.'s anus. (Doc. 37-3 at 435–39) Yarbrough's DNA matched ten out of thirteen areas of DNA on one swab from inside A.R.'s anal canal, and the frequency of occurrence in the Caucasian population was one in twenty-four trillion. (Doc. 37-3 at 440–41) Yarbrough's DNA matched thirteen out of thirteen areas of DNA on a second swab from inside A.R.'s anal canal and thirteen out of thirteen areas of DNA on the tan shorts, and the frequency of occurrence in the Caucasian population was one in sixty-seven quadrillion. (Doc. 37-3 at 441–44) Yarbrough is Caucasian. (Doc. 37-2 at 2)

3

Yarbrough called several witnesses for his defense. The couple who lived with Yarbrough testified that they heard nothing unusual late that night or early in the morning. (Doc. 37-3 at 498–99, 525–26) The wife went to the bathroom at 4:20 A.M. and saw A.R. sleeping in the chair in the living room. (Doc. 37-3 at 500) The husband went to the bathroom and the kitchen several times and saw A.R. sleeping in the chair. (Doc. 37-3 at 523–24) Around 7:00 A.M., the couple heard A.R. get up out of the chair, A.R.'s father come inside, and A.R. and his father laugh while they cooked breakfast in the kitchen. (Doc. 37-3 at 501–02, 524–25) Later that morning, the couple heard Yarbrough, Yarbrough's grandmother, and A.R.'s father arguing. (Doc. 37-3 at 502–03, 524)

A forensic pathologist testified that semen may transfer from clothing to the skin of a person for up to twenty-four hours, that when swabbing the inside of the anus, the swab possibly collects evidence from outside the anus, and that in his experience he always observes medical evidence when anal penetration occurs. (Doc. 37-3 at 545, 560–61, 586–87) The pathologist would not base an opinion that anal penetration occurred only on an accusation by a child, not corroborated by medical evidence. (Doc. 37-3 at 569) The pathologist reviewed medical records, lab reports, child protection team reports, and depositions from this case and opined that anal penetration in this case was "highly unlikely." (Doc. 37-3 at 572)

Yarbrough's grandmother testified that she and Yarbrough decided that A.R.'s father and his children needed to move out. (Doc. 37-3 at 602–03) An argument between Yarbrough and A.R.'s father ensued, and A.R.'s father told Yarbrough, ". . . payback time, boy, and it's going to be mighty sweet." (Doc. 37-3 at 605–06) Yarbrough's grandmother did not sleep well that night, saw A.R. sleeping in the chair in the living room, did not hear anything unusual in the middle of the night, and would have heard any commotion because Yarbrough's

bedroom did not have a door. (Doc. 37-3 at 608–10) The next morning, A.R.'s father told her that Yarbrough had raped A.R. (Doc. 37-3 at 612) A.R.'s father put a knife to Yarbrough's throat and asked him, "What did you do to my son?" (Doc. 37-3 at 612) Yarbrough responded, "[M]y God, I did nothing to your son." (Doc. 37-3 at 612)

A.R.'s great aunt, who lived next door to Yarbrough, testified that A.R.'s father came over that night, just after Yarbrough had told him to leave. (Doc. 37-3 at 642–43) A.R.'s father very angrily said that he was going to "get even" with Yarbrough, and "[n]o matter what it took, he was going to fix him good." (Doc. 37-3 at 643–44)

Yarbrough testified that A.R. regularly borrowed his clothing without permission. (Doc. 37-3 at 672–73) Yarbrough had worn the tan shorts a few days before A.R. wore the shorts, had ejaculated on the shorts, and had placed them in a laundry basket. (Doc. 37-3 at 676–79) The evening before A.R. accused Yarbrough of the sexual battery, Yarbrough told A.R.'s father that he and his family would have to leave because A.R.'s father refused to contribute to expenses for the home. (Doc. 37-3 at 673–74, 681–82) A.R.'s father put his finger in Yarbrough's face and responded, "If you make me and my kids leave tonight and stay on the street, motherf*cker, you're going to pay for this. And I'm going to get you back for this if we have to leave tonight." (Doc. 37-3 at 689) Yarbrough told A.R.'s father to leave. (Doc. 37-3 at 690) A short time later, A.R. and his father left. (Doc. 37-3 at 691)

Yarbrough saw some medication that belonged to A.R.'s father on the kitchen table. (Doc. 37-3 at 692) Yarbrough's grandmother placed the medication on a chair outside near the front door. (Doc. 37-3 at 692–93) Later that evening, A.R. knocked on the door, Yarbrough answered, and A.R. told Yarbrough that his father wanted to speak with him. (Doc. 37-3 at 703–04) Yarbrough took the medication on the chair to A.R.'s father, who

remained in the car. (Doc. 37-3 at 705) Yarbrough told A.R. to go inside the home while Yarbrough spoke with A.R.'s father. (Doc. 37-3 at 706) Yarbrough allowed A.R. to sleep inside, went to bed, and woke up the following morning when A.R.'s father held a knife to his throat. (Doc. 37-3 at 707, 712–16) Yarbrough denied committing the sexual battery. (Doc. 37-3 at 719–20)

## STANDARDS OF REVIEW

### AEDPA

Because Yarbrough filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A decision involves an unreasonable application of clearly established federal law "if the state

court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the U.S. Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on state

procedural grounds, the federal court instead denies the claim as procedurally barred. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

Also, a federal court will not review a federal claim that the state court denied on an independent and adequate state procedural ground. *Coleman*, 501 U.S. at 729–30. The last state court reviewing the federal claim must clearly and expressly state that its decision rests on the state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989). If the last state court denied the federal claim in an unexplained decision, the federal court looks through the unexplained decision to the last reasoned order to rule on the claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). If the last reasoned order imposed a state procedural bar, the federal court presumes that the later unexplained decision did not silently disregard the bar and consider the merits. *Ylst*, 501 U.S. at 803.

A petitioner may excuse a procedural bar on federal habeas by either (1) showing cause and actual prejudice from the alleged violation of federal law or (2) demonstrating a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

**Ineffective Assistance of Counsel**

Yarbrough asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

8

"[T]here is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

 "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citation omitted). "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas

proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

The state appellate court affirmed in a decision without a written opinion the post-conviction court's order denying Yarbrough relief. (Doc. 37-6 at 416) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Because the post-conviction court recognized that *Strickland* governed the claims (Doc. 37-5 at 280), Yarbrough cannot meet the "contrary to" test in Section 2254(d). Yarbrough instead must show that the state court either unreasonably applied *Strickland* or unreasonably determined a fact.

## ANALYSIS

### Ground One

Yarbrough asserts that the trial court violated his federal right to due process and right to present a defense by excluding testimony by Jacqueline Weeks and her three children. (Doc. 1 at 7–8) He contends that Weeks and her children would have testified that Yarbrough lived with them for over a year, regularly cared for the minor children while Weeks went to school, and never abused the children. (Doc. 1 at 7–8) He contends that the testimony would have supported his theory of defense that he did not sexually abuse A.R. (Doc. 1 at 9)

The Respondent asserts that the ground is unexhausted and procedurally barred. (Doc. 37 at 17) Yarbrough raised this claim in issue one of his brief on direct appeal, cited an opinion by the U.S. Supreme Court, and argued that his federal right to present a defense required the admission of the testimony (Doc. 37-4 at 32) (bolding added):

> Where evidence tends in any way, even indirectly, to establish reasonable doubt, it is error to deny its admission. *See Rivera v. State*, 561 So. 2d 536 (Fla. 1990); *Mateo v. State*, 932 So. 2d 376 (Fla. 2d DCA 2006). **This principle is based, in part, on the United States Supreme Court's holding in *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L.Ed.2d 297 (1973), that few rights are more fundamental than that of an accused to present witnesses in his own defense.** *See Mateo*[ ], 932 So. 2d [at] 376 [ ]. Thus, as a general proposition, any evidence that tends to support the defendant's theory of defense is admissible, and it is error to exclude it. *See* [*id.*]

Because Yarbrough "cit[ed] in conjunction with the claim the federal source of law on which he relie[d] or a case deciding such a claim on federal grounds," he fairly presented the federal claim to the state court. *Reese*, 541 U.S. at 32. Yarbrough must demonstrate that the state court either unreasonably applied clearly established federal law or unreasonably determined a fact. 28 U.S.C. § 2254(d)(1), (2).

Before trial, trial counsel moved to admit the testimony, and the prosecutor moved to exclude the testimony. (Doc. 37-2 at 20) At a hearing, trial counsel summarized the proposed testimony and argued that the testimony was admissible, as follows (Doc. 37-2 at 21–25):

> [Trial counsel:]   The defense filed a motion for a pretrial ruling on the admissibility of witness[es'] testimony. . . . Judge, in this case, Mr. Yarbrough was charged with one count of capital sexual battery. He's alleged to have [anally] penetrated a nine-year-old, and then there is a second count of lewd and lascivious molestation.
>
> Sometime ago, Donald Yarbrough gave me information regarding a time that he lived up in Alabama with a cousin, an adult cousin. In fact, the cousin was older than him. Her name is Jacqueline Weeks. And he gave me information letting me know that he lived with her and with her

three children, and he lived with her for up to a year, perhaps longer, and that at numerous times while he was living up there with her, and in fact it was his job while he lived there with her, he was to take care of the children. The children ranged in ages from roughly three to ten during the period of time that [Yarbrough] watched these children. Sometimes he would watch them for extended periods of time when the mother, his cousin, would be out of town and in school and involved in a number of different things. So [Yarbrough] brought to my attention he would like me to list these witnesses and he would like me to call these witnesses at the trial of his case.

Now, during — I did that. I filed a witness list, and I listed the witnesses and [the prosecutor] had an opportunity to speak with the witnesses. During the course of my representation, I explained to [Yarbrough] that, you know, reputation through this type of testimony was only admissible under certain circumstances. And I think the Florida Evidence Code allows for, in situations where there's a reputation for being an aggressor or being peaceful and for truthfulness.

So I was somewhat reluctant to file this motion. Although I know he has a right to make a proffer, and so that's essentially what I'm doing today. Because these witnesses live in Alabama and because he believes they're critical to his case, because these witnesses would testify during that period of time that there was never any suspicion that Donald Yarbrough did anything sexually inappropriate to these children. The mother was never suspicious about [Yarbrough's] behavior around the children. In fact, she spoke with all of the children and the children all said that

[Yarbrough] had never done anything sexual or inappropriate.

. . .

. . . I [ ] did not file this motion to allow these witnesses to testify in this case until I came across a case out of the State of Florida called *Mateo versus State of Florida*. I don't have the Southern Second cite, Judge, but it's a case out of the Second District Court of Appeals. The opinion was filed on the 31st of March of 2006. It's case number 2D04-1191.

Judge, in this case, although the facts are somewhat different and the evidence that the defense wanted to get in is somewhat different, this case basically states a legal proposition that says that the rules of evidence that apply to the State and the defense, although both sides essentially have to follow the rules of evidence, that when it comes to the defendant, that the rules could be different. In fact, on page 4 of that opinion, beginning at the bottom, it states, "Florida law is clear that where evidence tends in any way, even indirectly, to establish a reasonable doubt of defendant's guilt, it is error to deny its admission." It says, "[T]his principle is based in part on the U.S. Supreme Court's holding that few rights are more fundamental than that of an accused to present witnesses in his own defense; thus, as a general proposition, any evidence that tends to support the defendant's theory of defense is admissible. It is error to exclude it."

It begins the next paragraph on page 5: "Further, while the defense is bound by the same rules of evidence as the State, the question of what is irrelevant to show a reasonable doubt may present different considerations than the question of what

is irrelevant to show the commission of a crime itself."

So essentially, [Yarbrough's] theory in wanting to put these witnesses on and wanting to put this testimony on is, I guess in a way, it's character evidence or it's a lack of propensity evidence because he believes that if these witnesses testified and they testified to the fact that he lived with them as he said, and watched them as he said, for these several months and possibly over a year, that the jurors would accept that testimony as proof that [Yarbrough] is not the sort of [ ] person who would sexually abuse children. He's not a sexual molester and he's not a pedophile.

So based on his request and based on his right to put testimony on and based on that *Mateo* case, I decided to file this motion and ask the Court for [a] pre-trial ruling on the admissibility of these witnesses, and as I said, they are up in Alabama, Judge.

[Court:]     All right. Before I ask the State to respond, apparently one of the witnesses, whose name is Jacqueline Weeks, who is the mother of the three children, and as I understand your representation, Mr. Yarbrough lived with them for a period of time, and so when was that period of time?

[Yarbrough:]     From 2001 to — early 2001 to late 2002, August.

After the prosecutor presented argument and trial counsel presented rebuttal, the trial court denied the motion as follows (Doc. 37-2 at 38–40):

[Court:]     Okay. Thank you. Well, I hate to do this because I don't — I'm going to grant the State's motion [to exclude]. I'm going to deny the defendant's motion and find

14

these witnesses could not testify as has been represented.

Now, here's the problem I have. This is always a problem with any kind of evidentiary ruling. I know Mr. Watson should be congratulated for trying to save everybody some money by bringing witnesses from out of state. It's possible, depending on what the State ends up putting on, that maybe these people's testimony would be relevant. I will tell you right now, I agree with the State, that the fact that other people will come in and say Mr. Yarbrough took care of my kids during a period of time, and I'm not sure whether it was during this period of time or two years earlier. Apparently we have a possibility of both situations. I'm not convinced that that's admissible under any set of circumstances unless of course it was directly relevant to the situation in which this supposedly happened, which the State has represented it was not. For example, if Mr. Yarbrough were somebody on a regular basis [who] looked out for this child as he did other children, maybe it would be, but apparently that's not the case.

. . .

— I don't see the distinction at this point that gets around essentially lack of arrest, lack of prior criminal history, lack of committing an offense of any kind is somehow relevant character evidence other than the trait and this is clearly not a trait case to me. So I'm going to essentially say from what's been represented to me, I don't believe these witnesses can testify.

Now, Mr. Watson, I don't know that that helps you any, because, as I said, I don't know what the State's case is going to end

up being and it may be that perhaps not all of these people but some of these people might be able to testify, depending on what the State's evidence turns out to be. I don't know yet. I know there's supposedly some chemical evidence issues maybe. I don't know. But it looks like there might be and some other things. So I don't know what to tell you.

[Trial counsel:]     I understand.

[Court:]     I'm making the ruling because you asked me to make the ruling and I'm making it this morning and I'm saying you can't.

[Trial counsel:]     Okay.

[Court:]     This is without prejudice to you making it relevant because I can anticipate a possibility that it would be and I don't want the State to be able to say, oh, wait a minute, back on June 6th, Judge Dakan said he couldn't do it, Judge, so you can't go behind that, because you may be able to put something together that makes it relevant, so I don't know what to tell you as far as bringing your witnesses.

[Trial counsel:]     I understand, Judge.

[Court:]     Apparently you have some depositions and I don't know whether that will help. But right now I would say, absent anything else, no, you would not be able to put those witnesses on.

[Trial counsel:]     Okay, Judge. Judge, in as much as this particular motion is concerned though, I'm essentially asking the State to accept the representations in my —

[Court:]     Right.

[Trial counsel:]     And the dates that [Yarbrough] gave me as my proffer.

[Court:]     Yes, sir.

At trial, trial counsel proffered testimony by Weeks and one of her sons. Weeks testified that Yarbrough, who is her cousin, lived with her and her three sons in Alabama before he moved to Florida. (Doc. 37-3 at 820–21) Yarbrough lived with Weeks and her sons for about a year between 2000 and 2001. (Doc. 37-3 at 821, 828) During that time, Weeks worked full-time as a probation officer and studied full-time for a master's degree. (Doc. 37-3 at 821) Yarbrough regularly cared for Weeks's sons who were about six, seven, and ten years old, even when Weeks spent a night or two away from the home. (Doc. 37-3 at 822–23) Weeks never suspected that Yarbrough acted inappropriately around her children. (Doc. 37-3 at 823) After learning about Yarbrough's criminal charges, Weeks asked her children if Yarbrough had ever acted inappropriately around them and felt relieved after her conversation. (Doc. 37-3 at 823–24)

Weeks's son testified that Yarbrough, who is his second cousin, lived with him, his brothers, and his mother. (Doc. 37-3 at 826) Her son confirmed that Yarbrough took care of him and his brothers while Weeks was busy. (Doc. 37-3 at 826) Her son denied that Yarbrough "ever [did] anything to [him] that was wrong sexually." (Doc. 37-3 at 827) Her son further denied ever observing Yarbrough "do anything sexually inappropriate to [his] younger brothers." (Doc. 37-3 at 827) The parties stipulated that Weeks's two other sons would have testified in the same manner. (Doc. 37-3 at 828)

Trial counsel also renewed his motion to admit the testimony by Weeks and her sons. (Doc. 37-3 at 734) A successor judge adopted the predecessor judge's ruling and denied the motion as follows (Doc. 37-3 at 735–37):

[Court:]     All right. I think another judge had already ruled that would not be admissible.

[Trial counsel:]   Judge Denkin did.

[Court:]     Right. And I agree with that ruling. I will allow you to put on their testimony in the form of a proffer. It will have to wait. We won't do that right now, but I will allow you to put it on the record.

[Trial counsel:]   Okay, Judge. Judge, you know, I understand typically when character and reputation testimony can come in, and I know that this is something that ordinarily wouldn't come in and I wouldn't even attempt to make a proffer, first of all. But Mr. Yarbrough wanted it in, and so I'm accommodating Mr. Yarbrough and I appreciate you allowing us to do this.

         But the other reason, Judge, is, you know, there's recently been a change in the statute that allows evidence of prior sexual acts for any — for any reason, it's relevant for any reason, including showing bad character propensity because the — the — it's generational and so forth. And so there's been an evolution in the law over the years and we're at the point now regarding sexual cases, and only sexual cases, that evidence of propensity or former acts, without any *Williams* Rule or strike of similarity, is just allowed to come in to show bad character or propensity.

         It seems to me, Judge, that if the statute allows for that to come in under the new changes in the statute, that it could — if we carry it out to its logical extension of giving a defendant a fair opportunity to do the same thing, it seems to me that this is relevant and because that statute allows it into the prosecution as evidence of that, we believe that as a matter of due process

|  |  |
|---|---|
|  | and the right to put on and present a defense, that we should be allowed to do the same thing to show a lack of propensity. |
| [Court:] | Is there any — is there any case — |
| . . . |  |
| [Trial counsel:] | No, I don't know of any case law, Judge. |
| [Court:] | Okay. |
| [Trial counsel:] | No, I don't, but I'm just — |
| . . . |  |
| [Trial counsel:] | I don't — I'm not familiar with any — |
| . . . |  |
| [Prosecutor:] | Your Honor, also, I'd like to let the Court know that that argument was made as a motion *in limine* in front of Judge Denkin. So I'm not going to further argue it because that argument was made. |
| [Court:] | Okay. I'll maintain Judge Denkin's ruling on that . . . .[1] |

Under Florida law, "[w]hen character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may be made of specific instances of that person's conduct." § 90.405(2), Fla. Stat. Because Yarbrough's character was not an essential element of the sexual battery charge, the trial court properly excluded the testimony by Weeks and her sons. § 794.011(2)(a), Fla. Stat. (2004). *Pitts v. State*, 263 So. 3d 834, 839–40 (Fla. 1st DCA 2019) ("[Pitts's] girlfriend [ ] would have testified that Pitts had

---

[1] The trial judge allowed trial counsel to proffer testimony by Weeks and her son after the ruling. (Doc. 37-3 at 819–28)

never been 'sexually aggressive' towards her. This is effectively *specific-act* character testimony under section 90.405(2), and because Pitts's character trait for sexual non-violence was not an element of the charge in this case, the trial court properly excluded this testimony.") (italics in original).

The prosecution did not admit evidence that Yarbrough sexually abused Weeks's sons as similar fact evidence or evidence demonstrating that Yarbrough had the propensity to commit the sexually battery on A.R. Consequently, evidence that Yarbrough did not sexually abuse Weeks's sons was not relevant to rebut similar fact or propensity evidence. § 90.404(2), Fla. Stat. *Pitts*, 263 So. 3d at 839.

At trial, a nurse who worked at the emergency room testified that she first examined A.R. on the morning of July 1, 2004, after A.R. reported the sexual battery. (Doc. 37-3 at 240–43, 246) Weeks testified that Yarbrough lived with her and her sons more than three years earlier between 2000 and 2001. (Doc. 37-3 at 821, 828) A.R. was not related to Yarbrough. Weeks's sons were Yarbrough's second cousins. (Doc. 37-3 at 826) Evidence that Yarbrough did not abuse his second cousins in 2000 or 2001 was not relevant to whether Yarbrough sexually abused A.R., his roommate's son, in 2004. § 90.401, Fla. Stat. *Alvelo v. State*, 769 So. 2d 476, 477 (Fla. 5th DCA 2000) ("We find no error in the court's not permitting a string of witnesses to testify that appellant had never abused them or anyone they knew. Such would be irrelevant to the question as to whether appellant abused the victim.").

Yarbrough fails to demonstrate that the trial court ruled contrary to or unreasonably applied "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[T]he Constitution guarantees criminal defendants a

meaningful opportunity to present a complete defense but [the U.S. Supreme Court has] also recognized that state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (citations and internal quotations omitted). "Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citation omitted). "Only rarely [has the U.S. Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Jackson*, 569 U.S. at 509 (citations omitted).

The rule excluding the testimony by Weeks and her sons is neither "arbitrary" nor "disproportionate to the purposes [it] [is] designed to serve." *Scheffer*, 523 U.S. at 308. The 1976 Law Revision Council Note to Section 90.405 (bolding added) explains:

> The section confines the use of specific instances of conduct to cases in which character is in issue; that is, when character is one of the facts necessary to establish a liability or defense or is a factor in the measurement of damages. When character is used circumstantially and hence occupies a lesser status in the case, proof may be only by reputation and opinion. **Of the three methods of proving character provided by this section, evidence of specific instances of conduct is the most convincing. At the same time it possesses the greatest capacity to arouse prejudice, confuse, surprise, or consume time. Consequently, the use of evidence of this kind is confined to cases in which character is, in the strict sense, in issue, and hence deserving of a searching inquiry.** This treatment of specific instances of conduct, as well as the treatment of reputation, follows conventional contemporary common-law doctrine.

Because Yarbrough's character was not an essential element of the sexual battery charge and the testimony by Weeks and her sons was not relevant to the sexual battery on A.R., the trial court's exclusion of the testimony did not infringe on "a weighty interest" of

Yarbrough. *Scheffer*, 523 U.S. at 308 ("[W]e have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.").

Yarbrough asserts that the trial court unreasonably applied *Chambers*. (Doc. 51 at 14) In *Chambers*, 410 U.S. at 287–90, the defendant attempted to introduce into evidence another individual's confession to the charged murder. In this case, Yarbrough attempted to introduce irrelevant testimony by his cousin and his second cousins about his good character three years before the charged crime. In *Chambers*, 410 U.S. at 285–86, only tenuous eyewitness testimony proved that the defendant committed the crime, and no physical evidence proved guilt. In this case, swabs from A.R.'s anal canal contained DNA that matched Yarbrough's DNA. In *Chambers*, 410 U.S. at 302–03, the other individual's confession was critical to the defense, and exclusion of that evidence deprived the defendant of a fair trial. In this case, Yarbrough contended that A.R. borrowed his shorts without permission and that police found his DNA in A.R.'s anal canal because he had ejaculated into the pants a few days earlier. Yarbrough contended that A.R. and his father fabricated the accusation of sexual battery because Yarbrough had removed them from his home. Because the trial court's exclusion of the testimony by Weeks and her sons did not deprive Yarbrough of that defense, the trial court did not unreasonably apply *Chambers*. *See Pittman v. Sec'y, Fla. Dep't Corrs.*, 871 F.3d 1231, 1246–49 (11th Cir. 2017); *Barrass v. Sec'y, Fla. Dep't Corrs.*, 766 F. App'x 760, 767–68 (11th Cir. 2019).


Ground One is **DENIED**.

**Ground Two**

Yarbrough asserts that the trial court violated his federal right to due process by excluding evidence that A.R.'s father had falsely accused A.R.'s mother three times of battery. (Doc. 1 at 13–20)

The Respondent asserts that the ground is unexhausted and procedurally barred. (Doc. 37 at 20–21) Yarbrough raised this claim, together with the claim in Ground One, in issue one of his brief on direct appeal, cited *Chambers*, and argued that his federal right to present a defense required the admission of the evidence. (Doc. 37-4 at 32) Because Yarbrough "cit[ed] in conjunction with the claim the federal source of law on which he relie[d] or a case deciding such a claim on federal grounds," he fairly presented the federal claim to the state court. *Reese*, 541 U.S. at 32.

At trial, trial counsel moved to admit testimony by A.R.'s mother about the false accusations by A.R.'s father. (Doc. 37-3 at 592–93) The trial judge allowed trial counsel to proffer testimony by A.R.'s mother. (Doc. 37-3 at 593) A.R.'s mother testified that police arrested her three times for battery after A.R.'s father reported the crimes. (Doc. 37-3 at 627) A.R.'s mother contended that the accusations were false. (Doc. 37-3 at 627–28) The prosecutor dismissed the battery cases even though A.R.'s father swore that she had hit him. (Doc. 37-3 at 628) A.R.'s mother contended that she was wrongly arrested each time. (Doc. 37-3 at 628)

The trial judge heard argument by the parties and denied the motion to admit the testimony, as follows (Doc. 37-3 at 628–31):

> [Trial counsel:]      Okay, Judge. Well, the theory of the defense's case is basically that this is a

false accusation against Donald Yarbrough and it's our position that [A.R.'s father] influenced [A.R.] to make up this accusation as a result of what had transpired the night before and the threats to pay him back, and taking that into account with what [A.R.'s mother] just testified about regarding [A.R.'s father] making three false accusations of battery against her, we believe it goes to the credibility of [A.R.'s father] and the possibility or probability that he acted likewise in this case and influenced this child to make a fabrication against Donald Yarbrough.

[Court:]          All right, Ms. Buff.

[Prosecutor:]     Your Honor, I would submit that these are prior bad acts. It's — really it would go towards an issue of credibility. [A.R.'s father] is deceased. He's not a witness in this case and therefore his credibility is not at issue and it is not properly impeached. I mean, that's what this is, is impeachment against the credibility of a witness who's not a witness.

[Court:]          All right. In that the evidence we have in this case is that [A.R.] is the individual who made the complaint, and although perhaps reported to law enforcement by [A.R.'s father], the only testimony in this trial has been from the child with no testimony from him in any way that the father had influenced his testimony or told him to say a certain thing.

                  If this were a case in which [A.R.'s father] were making an allegation of being the victim of the defendant, I think that would be another result. But because the alleged victim in this case is the child and not [A.R.'s father], I do not think a previous report by [A.R.'s father] alleging a battery which this witness says was not true

| | |
|---|---|
| | would be admissible evidence. So I would sustain the objection. |
| [Trial counsel:] | Judge, can I just say one thing for the record regarding that? I understand the Court's ruling. |
| [Court:] | Yes. |
| [Trial counsel:] | I just wanted to say that we know that between the time of this alleged incident and the report, a lot of time transpired where [A.R.'s father] was with his child and we also know that based on what was just heard from the last witness, that on the night that [Yarbrough] told him they had to leave, she testified that he said it was payback time. So that's all on the record. |
| [A.R.'s mother:] | Your Honor, may I say something? |
| [Court:] | Not at this point, ma'am, no, unless either side wants to ask any more questions of her. |
| [Prosecutor:] | No. I think that we're addressing a legal issue that's appropriately being dealt with. |
| [Trial counsel:] | That's all I wanted to say, Your Honor. |

At trial, A.R.'s father did not testify. A.R.'s mother testified that A.R.'s father died in 2005 (Doc. 37-3 at 622), and the trial occurred in 2006. (Doc. 37-3 at 476) During the defense case-in-chief, Yarbrough's grandmother testified without objection that A.R.'s father came into her room and said, "[Y]our grandson, [ ] he raped my son." (Doc. 37-3 at 612) Yarbrough testified without objection that A.R.'s father came into his room, held a knife to his throat, and asked, "Did you molest my son?" (Doc. 37-3 at 716) During the prosecution's case, A.R. testified that he told his father what happened the morning after

the crime, his father told a police officer what happened, and his father took him to the hospital. (Doc. 37-2 at 78, 82)

Under Florida law, "[w]hen a hearsay statement has been admitted in evidence, credibility of the declarant may be attacked and, if attacked, may be supported by any evidence that would be admissible for those purposes if the declarant had testified as a witness." § 90.806, Fla. Stat. "Any party, including the party calling the witness, may attack the credibility of a witness . . . ." § 90.608, Fla. Stat.

A party may impeach a witness with a prior false accusation of a crime. *Baker v. State*, 804 So. 2d 564, 567 (Fla. 1st DCA 2002) (citations omitted), explains:

> Under sections 90.609 and 90.610, Florida Statutes, the character of a witness may be impeached by evidence of reputation for truthfulness or by evidence of criminal convictions. While it is generally true that, other than evidence of prior convictions under section 90.610(1), credibility may not be attacked by proof that the witness has committed specific acts of misconduct which bear on the truthfulness of the witness, the Second District Court of Appeal has recognized an exception to this rule permitting impeachment with prior acts of misconduct that involve prior false accusations of a crime by the witness.

*Jaggers v. State*, 536 So. 2d 321, 327 (Fla. 2d DCA 1988) (citations omitted), explains that the impeachment evidence is relevant to the witness's credibility:

> [F]or every broad general principle of law, there seems to be an exception applicable to particular circumstances. Section 90.405(2), Florida Statutes (1985) allows proof of specific incidents of conduct where that evidence is offered to prove a particular trait of character. In this case, that trait of character was that the witness may be inclined to lie about sexual incidents and charge people with those acts without justification.
>
> There is a long line of authority from this court and others which permits the type of testimony on cross-examination that was prohibited here. Evidence that is relevant to the possible

> bias, prejudice, motive, intent or corruptness of a witness is nearly always not only admissible, but necessary, where the jury must know of any improper motives of a prosecuting witness in determining that witness' credibility. That is particularly true in the case of allegations of sexual abuse where there is no independent evidence of the abuse and the defendant's sole defense is either fabrication or mistake on the part of the alleged victims.

*Carlisle v. State*, 137 So. 3d 479, 484–85 (Fla. 4th DCA 2014) (bolding added),

explains that *Pantoja v. State*, 59 So. 3d 1092 (Fla. 2011) (plurality), later qualified the rule

in *Jaggers*, as follows:

> *Pantoja* addressed the admissibility of the false accusations under 90.608(2), which allows impeachment by "'[s]howing that the witness is biased.'" *Id.* at 1097 (quoting § 90.608(2), Fla. Stat. (2002)). The Court found that "the facts of *Jaggers* did support the use of false reporting evidence to establish bias or motive pursuant to section 90.608(2)," but also concluded that the section did not apply to the facts of *Pantoja*. *Id.* The Court distinguished the *Pantoja* fact pattern from *Jaggers* under the following indicia: **whether the prior allegations of abuse were against the defendant or a different person,[8] the degree to which the current allegations of abuse and past allegations of abuse were similar, and whether the past allegations of abuse gave rise to a motive to lie in the current allegations.** *See id.* Applying these factors to Pantoja's appeal, the Court concluded the evidence was not admissible under 90.608(2) because the past allegations were not against Pantoja, the manner of abuse was different (the past abuse involved touching on the outside of the clothing, the later abuse involved physical and oral sexual acts under the clothing), and the past allegations indicated no motive to lie because no one believed or acted on the past allegations. *See id.*
>
> > [8] As then Chief Justice Canady pointed out in a dissenting opinion, in *Jaggers* the past abuse allegations were not against the same person as the later allegations. *Id.* at 1101 (Canady, C.J., dissenting). However, the *Pantoja* plurality opinion mentioned this as an important factor.

The trial court excluded the testimony by A.R.'s mother to impeach A.R.'s father for bias because A.R. — not A.R.'s father — was the victim of the sexual battery. (Doc. 37-3 at 628–31) Further, A.R.'s father falsely accused A.R.'s mother, while A.R. accused Yarbrough. A.R.'s father falsely accused A.R.'s mother of a physical battery, while A.R. accused Yarbrough of a sexual battery. Because Yarbrough was not related to or claimed to know A.R.'s mother, Yarbrough could not conceivably argue that A.R.'s mother encouraged A.R. to accuse Yarbrough of sexual battery because of the false accusations by A.R.'s father. Consequently, the false accusations by A.R.'s father were not relevant to show bias. *Pantoja*, 59 So. 3d at 1097.

The rule excluding the testimony by A.R.'s mother is neither "arbitrary" nor "disproportionate to the purposes [it] [is] designed to serve." *Scheffer*, 523 U.S. at 308. The qualification in *Pantoja* logically excludes impeachment evidence of bias "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, [or] misleading the jury . . . ." § 90.403, Fla. Stat. *See also Alvarado-Contreras v. State*, 305 So. 3d 842, 845 (Fla. 2d DCA 2020) ("However, '[e]vidence of bias may be inadmissible if it unfairly prejudices the trier of fact against the witness or misleads the trier of fact.'") (citation omitted).

Yarbrough contends that the trial court unreasonably applied *Crane v. Kentucky*, 476 U.S. 683 (1986) and *Washington v. Texas*, 388 U.S. 14 (1967). (Doc. 51 at 25) In *Crane*, 476 U.S. at 685–86, the prosecutor's case "rested almost entirely on [the defendant's] confession and on [a] statement of his uncle," and the trial court excluded "any evidence about the duration of the interrogation [which led to the confession] or the individuals who were in attendance." *Crane*, 476 U.S. at 690–91, held "exclusion of this kind of exculpatory evidence

deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" In contrast, in this case, the prosecutor's case did not rely on an accusation or testimony by A.R.'s father. The prosecution's case rested almost entirely on testimony by A.R., corroborated by compelling DNA evidence. The trial court's exclusion of the evidence impeaching A.R.'s father did not deprive Yarbrough of a right to a fair trial.

Likewise, in *Washington*, 388 U.S. at 16, the defendant, who was charged with murder, moved to introduce testimony by his accomplice who had earlier been convicted of the same murder and "would have testified that [the defendant] pulled at him and tried to persuade him to leave, and that [the defendant] ran before [the accomplice] fired the fatal shot." The trial court excluded the accomplice's testimony because a state statute provided "that persons charged or convicted as coparticipants in the same crime could not testify for one another." *Washington*, 388 U.S. at 16. *Washington*, 388 U.S. at 23, held "that [the defendant] was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." In contrast, in this case, the testimony by A.R.'s mother concerning the false accusations by A.R.'s father was not "relevant and material" to Yarbrough's defense. Yarbrough contended that A.R. and his father fabricated the accusation of sexual battery because Yarbrough had told them to leave his home. However, the false accusations by A.R.'s father against A.R.'s mother about a different type of crime lacked any meaningful relevance to show bias. *Pantoja*, 59

So. 3d at 1097. Consequently, the trial court did not unreasonably apply *Crane* or *Washington*.

Ground Two is **DENIED**.

## Ground Three

Yarbrough asserts that trial counsel was ineffective for not objecting to the admission of photographs of A.R. during an examination by a nurse. (Doc. 1 at 21–23) The post-conviction court denied the claim as follows (Doc. 37-5 at 283–85) (state court record citations omitted):

> [T]he Defendant claims that his counsel was ineffective for failing to object to the introduction into evidence of graphic photos of the child victim taken during the rape examination. He asserts that the photos were introduced solely to inflame the jury and were cumulative in nature.
>
> The photos at issue appear in the record as State Exhibit 3 (depicts the victim, including his face, in a hospital gown on a hospital exam table), State Exhibit 4 (depicts the victim on all fours on the exam table and shows his buttocks and feet), and State Exhibit 5 (depicts a close-up of the victim's anal area). Exhibit 3 was admitted into evidence through the child victim's direct testimony, while Exhibits 4 and 5 were admitted through the direct testimony of Nurse Flath. Defense counsel did not object to admission of the photos.
>
> "Photographs are admissible to the extent that they fairly and accurately establish a material fact and are not unduly prejudicial." *Anderson v. State*, 841 So. 2d 390, 402 (Fla. 2003). Photographic evidence is routinely admitted when it is used to explain medical testimony. *Schoenwetter v. State*, 931 So. 2d 857, 873 (Fla. 2006). The fact that nudity may be involved does not render photographs inadmissible. *See Anderson*[, 841 So. 2d] at 402; *see also Grey v. State*, 727 So. 2d 1063, 1065 (Fla. 4th DCA 1999) (holding that trial court did not err in admitting photograph depicting injuries of victim's head which extended down to include her naked breasts).

> In this case the photos were used to explain some of the physical
> and medical evidence presented to the jury. Defendant's
> counsel stated in his opening statement that his expert witness,
> Dr. Hoffman, would testify that, in every case he has seen with
> anal penetration of a child, there was some physical evidence.
> Counsel added that in this case, "there was no reddening that
> would substantiate an act of penetration by an adult male."
> When Dr. Hoffman testified during cross-examination, he
> acknowledged that injury to the anus, perineum, or buttocks
> could be from "light pink to all the way up to hemorrhaging."
> The issue of possible redness or injury to the child victim's anal
> area, therefore, was material and the photos accurately
> established its appearance at the time of the exam.
> Additionally, when Nurse Flath testified about the rape
> examination, defense counsel attempted to impeach her by
> showing an apparent contradiction between her notations of a
> reddened anal/rectal area and the fact that Dr. Garby did not
> make a similar notation. Since Nurse Flath assisted in the
> collection of DNA samples, her credibility was crucial to the
> State's case and the photos were relevant to illustrate that there
> was some redness in the area and that she was not mistaken in
> her observation.
>
> Upon review of this record, the Court finds that the photos were
> used in a relevant manner and were not overly prejudicial. As
> argued by the State, the photos are less prejudicial than the
> autopsy photos of bodies and photos of decomposed bodies
> admitted in cases involving death. *Grey*[ ], 727 So. 2d at 1065.
> [This claim] is denied.

Whether the photographs were admissible under state rules of evidence is an issue of

state law, and the state court's determination of state law receives deference in federal court.

*Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985) ("The federal courts must defer

to a state court's interpretation of its own rules of evidence and procedure.").

During opening statements, trial counsel told the jury that the defense's expert would

testify that he observed no evidence of a sexual assault on A.R. (Doc. 37-3 at 40):

> [Trial counsel:]       In [A.R.], it's very clear. Not only does he
>                        say that [Yarbrough] penetrated him, but
>                        he says [Yarbrough] humped him in the
>                        bed. Dr. Hoffman, who the defense will be

> calling, will tell you that in all of the cases of sexual assault that he's been involved in, in every case where an adult male has anally penetrated a child, that he has seen evidence and he's done hundreds of these examinations also. There was nothing. There was no bleeding, there was no tearing, there was no sphincter problems, there was no reddening that would substantiate an act of penetration by an adult male. There was absolutely no evidence.

During cross-examination, trial counsel impeached the nurse about her observation of redness in the area of A.R.'s anus (Doc. 37-3 at 280–86):

| [Trial counsel:] | Did you observe the rectal area to be reddened? |
|---|---|
| [Nurse:] | I thought it looked a little red, yes. |
| [Trial counsel:] | Okay. Now, let's make sure that we understand what we're talking about. You wrote in that official report you just spoke of that the rectal area was reddened, right? |
| [Nurse:] | Correct. |
| . . . | |
| [Trial counsel:] | Okay. Now, [despite] the fact you might be able to make an argument, when we're talking about anatomy and medical terms, certain terms define certain areas, correct? |
| [Nurse:] | (Nodding.) |
| [Trial counsel:] | Is that "yes"? |
| [Nurse:] | Yes. Correct. |
| [Trial counsel:] | So, did you see the rectal area reddened? |
| [Nurse:] | I would say that it is the actual anus that looked red to me. |

[Trial counsel:]     Okay. So, it's not the rectal area you saw because you'd have to look up inside him to see that, right?

[Nurse:]     That's correct.

[Trial counsel:]     So, what you really meant was the anus area was reddened; is that fair?

[Nurse:]     That's fair.

[Trial counsel:]     Okay. Now, did you observe this or did you think you heard Dr. Garby say something about it?

[Nurse:]     No. I observed it.

[Trial counsel:]     And what was it about that that when you observed it that caused you to think it was something that you needed to write down?

[Nurse:]     Because it looked unusual.

[Trial counsel:]     Do you know — if, indeed, it was reddened at all, do you know what may have caused that reddened area?

[Nurse:]     No.

. . .

[Trial counsel:]     And when you say — and when you say it was unusual, what do you mean that it was unusual, it was reddened? What does that mean?

[Nurse:]     It looked irritated.

[Trial counsel:]     So, it was reddened and irritated or was it just reddened?

[Nurse:]     Well, I would say one describes the other.

[Trial counsel:]     So, something — anything that's red has to be irritated; is that what you're saying?

33

| [Nurse:] | I would — I guess you could say that. I would say that, if something's irritated-looking. How else would you know it's irritated? |
|---|---|

. . .

| [Trial counsel:] | Now, when Dr. Garby came down at 8:15, he did a physical examination, too, correct? |
|---|---|
| [Nurse:] | Yes. |
| [Trial counsel:] | Okay. And you were right there when he did it? |
| [Nurse:] | Yes. |
| [Trial counsel:] | Okay. And did you hear Dr. Garby mention anything about the anus area being reddened? |
| [Nurse:] | Not that I recall. |
| [Trial counsel:] | Then you must have spoken with him about what you believe you saw, right? |
| [Nurse:] | It's written right here. |
| [Trial counsel:] | Yeah. Did you — did you tell him that you saw the anus area reddened? |
| [Nurse:] | It's possible. |
| [Trial counsel:] | Ma'am, did you tell him? Do you remember whether you did or you didn't? |
| [Nurse:] | I don't remember whether I did or I didn't. |

The first photograph depicted A.R. wearing a gown when he went to the hospital for the examination. (Doc. 37-3 at 84–85, 249) The second and third photographs depicted "[A.R.'s] bottom and a closer picture of it." (Doc. 37-3 at 249–50) Whether A.R. suffered

from redness in his anus just after he reported the crime was relevant to whether Yarbrough "with his sexual organ, penetrated or had union with the anus of A.R." (Doc. 37-2 at 3) § 794.011(1)(h), Fla. Stat. The defense argued that the lack of medical evidence of the sexual battery proved that Yarbrough did not commit the sexual battery. The photographs were relevant to rebut that defense, the photographs were not cumulative, and the probative value of the photographs was not outweighed by the danger of unfair prejudice. §§ 90.401 and 90.403, Fla. Stat.

Also, to establish a chain of custody, the nurse testified that she gave the swabs from the rape kit to the doctor and placed the swabs into an evidence bag after the doctor inserted the swabs into A.R.'s anal canal.  (Doc. 37-3 at 258–68) The prosecutor relied on DNA from the swabs to prove the crime, and the nurse assisted with the collection of that evidence. Because trial counsel called in question the nurse's credibility by challenging her observation of redness on A.R.'s anus, the photographs were relevant to rebut that attack on her credibility. § 90.608, Fla. Stat. *Bruno v. State*, 574 So. 2d 76, 80 (Fla. 1991).

If trial counsel had objected to the admission of the photographs, the trial court would have overruled the objection. Consequently, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the claim. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Ground Three is **DENIED**.

**Ground Four**

Yarbrough asserts that trial counsel was ineffective for not investigating the prosecution's DNA evidence and for not calling a DNA expert to testify at trial. (Doc. 1 at 24–27) The post-conviction court denied the claim as follows (Doc. 37-5 at 279–81) (state court record citations omitted):

> [T]he Defendant contends his counsel was ineffective for (a) failing to send additional discovery material concerning rectal swabs collected from the victim to a consulting DNA expert, Dr. Alan Friedman; . . . and ([b]) failing to call Dr. Friedman as a trial witness.
>
> . . .
>
> The Court finds that [the claims] fail[ ] to satisfy the prejudice prong of *Strickland*. The overarching defense theory in this case was that DNA material in the form of sperm was innocently transferred from the Defendant to the child victim when the victim wore the Defendant's soiled shorts a few days after the Defendant had sex with a female and that the accusation against the Defendant was motivated by the desire of the victim's father to "get back at" the Defendant. Identity (that is, linking the DNA found in the victim's body to the Defendant) was not an issue in this case. The e-mails between Dr. Friedman and defense counsel attached to the Defendant's motion as Exhibits B and C do not suggest that any further test results would have benefitted the Defendant, nor do they indicate that Dr. Friedman disagreed with FDLE's findings or the manner in which they were reached. Thus, the Court cannot conclude that counsel's failure either to send additional discovery to Dr. Friedman concerning the test results on the rectal swabs or to call him as a trial witness "so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined." . . . [The claims are] denied.

Yarbrough attached to his post-conviction motion two e-mails between trial counsel and a DNA expert. In the first e-mail dated January 5, 2006, the expert provided a "preliminary summary of [his] findings" (Doc. 37-4 at 168):

> The DNA profile from the sperm fraction, anal swab, was incomplete and of poor quality. They only got a signal at 6 of 13 STR loci; it does match Yarbrough. Not surprisingly, the non-sperm fraction matches [A.R.] In my opinion, the quality of the sperm fraction DNA was poor and probably degraded. According to the quantitation and amplification worksheets, they had plenty of target DNA in the PCR reaction. The sperm and non-sperm fractions from the shorts are clean, complete profiles that match your guy. However, that's good since [A.R.'s] profile is not showing up in the non-sperm fraction of the shorts.

In the second e-mail dated February 6, 2006, the expert followed up (Doc. 37-4 at 171):

> [D]oesn't look good for your guy. They had previously reported on a partial profile from the anal swab 100A. Now they have tested a rectal swab, item 100B and obtained a complete 13 [loci] match to Yarbrough. If you want me to review the new evidence, I'll need the complete discovery packet; analyst notes, worksheets, e-grams and electronic files.

Yarbrough presented no evidence that additional investigation would have called into question the reliability or validity of the results showing that DNA from a swab of A.R.'s anal canal matched his DNA. Because Yarbrough only speculated that further investigation would have revealed exculpatory evidence, the post-conviction court did not unreasonably deny the claim. *Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) ("As we have explained, '[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.'") (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985)).

Also, he did not present an affidavit or other sworn testimony to show that the DNA expert would have presented exculpatory testimony. In his post-conviction motion, Yarbrough instead alleged that (Doc. 37-4 at 128):

> The fact is that [trial counsel] provided ineffective assistance for failing to effectively challenge the new submissions sent to F.D.L.E., by sending Dr. Friedman the proper material that he would need to investigate the laborator[y's] scientific conclusions[.] Had [trial counsel] done so, Dr. Friedman would have been able to reach an expert conclusion that the new submission was indeed flawed[.] Instead [trial counsel] simply conceded [ ] the new results [which] prejudiced Defendant during trial. Furthermore [trial counsel] rendered ineffective assistance for failing to call Dr. Friedman to testify for the defense at trial in which his testimony would have cast[ed] doubt on the prosecution's initial DNA results which would have affected the outcome of trial and would have ruined the credibility of the State's evidence.

"[A] petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice from the failure to interview or call that witness." *McKiver v. Sec'y, Fla. Dep't Corrs.*, 991 F.3d 1357, 1365–66 (11th Cir. 2021). "[The] prejudice burden is heavy where the petitioner alleges ineffective assistance in failing to call a witness because 'often allegations of what a witness would have testified to are largely speculative.'" *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) (citation omitted). Because Yarbrough failed to present some evidence that substantiated the DNA expert's proposed testimony, the post-conviction court did not unreasonably deny the claim.

Even so, the prosecution's expert testified at trial that DNA from A.R.'s anal canal matched Yarbrough's DNA (Doc. 37-3 at 443–44):

| [Prosecutor:] | Now, did there come a time when you received additional submissions of evidence from the Sarasota Police Department? |
|---|---|
| [Witness:] | Yes. |
| . . . | |
| [Prosecutor:] | [Y]ou hadn't done a testing on 100-B? |

| [Witness:] | I had not done DNA testing on 100-B. And I was asked at this point to also do DNA testing on that exhibit. |
|---|---|
| [Prosecutor:] | All right. Were you able to develop a DNA profile from that swab or swabs taken from [A.R.'s] rectal cavity that was foreign to [A.R.'s] DNA profile? |
| [Witness:] | Yes, I was. |
| [Prosecutor:] | In all 13 of the regions or loci? |
| [Witness:] | The DNA profile foreign to [A.R.] was DNA from 100-B, which were the rectal swabs and results were obtained in all loci tested. |
| [Prosecutor:] | Did you determine whose DNA profile matched that foreign DNA in [A.R.'s] rectum? |
| [Witness:] | Yes. The foreign DNA profile from the rectal swabs matches the DNA profile from Donald Yarbrough. |
| [Prosecutor:] | How common a profile is that [ ]? |
| [Witness:] | The frequency of occurrence of this profile from the rectal swabs in unrelated individuals is approximately 1 in 67 quadrillion [in] Caucasians, 1 in approximately 99 quadrillion [in] African Americans and 1 in 200 quadrillion [in] Southeastern Hispanics. |

Yarbrough is Caucasian. (Doc. 37-2 at 2) Even if the DNA expert would have "cast[ed] doubt" on the other DNA results, convincing DNA evidence proved that Yarbrough's semen was inside A.R.'s anal canal. Consequently, Yarbrough could not demonstrate a reasonable probability that the outcome would have changed, and the post-

conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694. *Knight v. Fla. Dep't Corrs.*, 936 F.3d 1322, 1340–41 (11th Cir. 2019).

Ground Four is **DENIED**.

**Ground Five**

Yarbrough contends that the pediatrician improperly vouched for the truthfulness of the victim and asserts that trial counsel was ineffective for not objecting to the testimony by the pediatrician. (Doc. 1 at 28–33) The post-conviction court denied the claim as follows (Doc. 37-5 at 281–83) (state court record citations omitted):

> [T]he Defendant claims that his counsel was ineffective because he did not object to Dr. Keeley's testimony in which she vouched for or commented on the credibility of the child victim.
>
> Dr. Keeley is the Medical Director of the Child Protection Team and at the time of trial she had been involved with the Team for 13 years. Although Dr. Keeley did not examine the child victim in this case, she did review the reports prepared by the emergency room physician, Dr. Garby, and the photographs taken at the time of the victim's emergency room examination. She testified that her "medical assessment confirm[ed] the diagnosis of child sexual abuse due to a credible history of sexual assault with a normal exam." She further explained that the child victim's lack of injuries did not negate a diagnosis of sexual abuse because "only 40 or 50 percent of children who have had anal sexual abuse will have abnormal medical findings. The majority have no findings at all." The Defendant argues that Dr. Keeley's testimony was solely used to improperly bolster the testimony of the child victim and his counsel should have objected for that reason.
>
> Under Florida law, "expert testimony may not be offered to directly vouch for the credibility of a witness." *Tingle v. State*, 536 So. 2d 202, 205 (Fla. 1988). The court in *Tingle*, however, also noted[:]
>
> > [A]n expert may properly aid a jury in assessing the veracity of a victim of child sexual abuse without usurping their exclusive function by generally testifying about a child's ability to

> separate truth from fantasy, by summarizing the medical evidence and expressing his opinion as to whether it was consistent with [the victim's] story that she was sexually abused, or perhaps by discussing various patterns of consistency in the stories of child sexual abuse victims and comparing those patterns with patterns in [the victim's] story.

*Id.* (quoting *United States v. Azure*, 801 F.2d 336, 340 (8th Cir. 1986)). The court in *Tingle* found that expert testimony improperly bolstered a witness when the expert directly stated that she believed that the child victim was telling the truth. *Id.*

In *Glendening v. State*, 536 So. 2d 212 (Fla. 1988), the court concluded that it was proper for an expert to express an opinion as to whether a child has been a victim of sexual abuse, but that it "was improper for the expert witness to testify that it was her opinion that the child's father was the person who had committed the sexual offense." *Id.* at 221.

Dr. Keeley's trial testimony is found at pages 190 through 235 of the trial transcript attached hereto as Attachment 1. After careful examination of the record, the Court finds that Dr. Keeley's testimony did not run afoul of the principles expressed in *Tingle* and *Glendening* and, therefore, an objection on that ground by defense would have been unavailing. There are several reasons for this conclusion.

First, Dr. Keeley did not testify that the child victim was telling the truth or that a certain percentage of child victims of sexual abuse are truthful. She only testified that her medical assessment confirmed the diagnosis of child sexual abuse and noted that "only 40 or 50 percent of children who have had anal sexual abuse will have abnormal medical findings. The majority have no findings at all." Her use of the phrase "credible history" in referring to the statement made by the child victim to the examining physician was incidental to her description of how a medical assessment is reached and not an endorsement of the child victim's veracity. The expert testimony here was less direct than the improper testimony at issue in *Tingle* and *Glendening*.

Second, Dr. Keeley testified for the purpose of presenting evidence that a child can be anally penetrated and yet not exhibit physical injuries. This testimony was necessary for the

State to counter the evidence presented by a defense expert, Dr. Hoffman, that in his experience he had always seen injury associated with anal penetration. This conclusion is borne out by the State's characterization of the purpose of Dr. Keeley's testimony during closing argument. The State refrained from emphasizing the notion that Dr. Keeley's testimony touched on the credibility of the child victim.

Finally, the Court finds that the Defendant was not prejudiced by his counsel's failure to object to Dr. Keeley's testimony on the ground of improper bolstering. *See Cole v. State*, 841 So. 2d 409, 418 (Fla. 2003) (deputy's testimony bolstering credibility of victim did not prejudice defendant for purposes of ineffective assistance claim where record contained other evidence supporting the victim's testimony). In the present case, additional physical evidence corroborated the child victim's testimony in that the Defendant's semen was found on the shorts the victim was wearing and inside the victim's anus. [The claim] is denied.

The post-conviction court unreasonably determined that the pediatrician did not vouch for the truthfulness of A.R. 28 U.S.C. § 2254(d)(2). But the post-conviction court correctly, alternatively, concluded that Yarbrough was not prejudiced by his counsel's failure to object to Dr. Keeley's testimony on the ground of improper bolstering.

At trial, the pediatrician testified that she did not examine A.R. and instead reviewed records from the doctor's examination of A.R. (Doc. 37-3 at 197–98) Based on her review of the records, the pediatrician opined that A.R. was the victim of a sexual assault, even though no medical evidence supported her opinion (Doc. 37-3 at 198–205):

| [Prosecutor:] | Based on your review of those medical records, did you form an opinion within a reasonable degree of medical certainty about medical findings for this child? |
|---|---|
| [Pediatrician:] | Yes, I did. |
| [Prosecutor:] | And what was that opinion or diagnosis? |

[Pediatrician:]   My statement is [that] the medical assessment confirms the diagnosis of child sexual abuse due to *a detailed credible history of sexual assault* with a normal exam.

[Prosecutor:]   Okay. So, let's go through that. First of all, what do you mean by "a normal exam"?

[Pediatrician:]   That there were no medical findings to indicate child sexual abuse when the patient was examined by Dr. Garby.

[Prosecutor:]   Okay. So, what kind of medical findings would — would you be looking for, so that the jury can understand what we're talking about with medical findings?

[Pediatrician:]   For an allegation of anal penetration, you would be looking for any abnormality of the perianal tissue: Scarring, tearing, bleeding, presence of sperm, anything that was out of the ordinary that would indicate some kind of trauma. You would also look for any kind of sexua[lly] transmitted disease, like a discharge or drainage coming from the anal area.

[Prosecutor:]   And were there any of those medical findings in this case, such as injury or sexually transmitted disease or discharge?

[Pediatrician:]   No.

[Prosecutor:]   How is it that — can you explain to the jury what that means, then, for you to find that it confirms the diagnosis of sexual abuse?

[Pediatrician:]   Yes. Only forty to fifty percent of children who have had anal sexual abuse will have abnormal medical findings. The majority will have no findings at all. So the diagnosis, as we do a medical assessment, an assessment includes the history and the physical, and so the diagnosis is made

43

|  | from the history portion of the assessment. That can include any sexual contact. |
|---|---|
| [Prosecutor:] | Okay. Now, just so that the jury can understand kind of what kind of diagnoses you could possibly come up with. If you did not find that the medical assessment confirmed the sexual abuse, what would be kind of the opposite of that? |
| [Pediatrician:] | The statement would have been more, the medical assessment does not support or confirm the diagnosis of child sexual abuse. |
| [Prosecutor:] | So based on your professional opinion, is the lack — is the lack of any visible injuries to the child's rectum or anus, is that inconsistent with an allegation of anal penetration? |
| [Pediatrician:] | It is consistent with an allegation of anal penetration because the majority of prepubital children who are sexually abused by anal penetration have no medical findings. |

. . .

| [Prosecutor:] | Have you previously been able to confirm allegations of — excuse me — anal penetration without physical findings? |
|---|---|
| [Pediatrician:] | Yes. |
| [Prosecutor:] | And is that — and how is that? How would you be able to do that? |
| [Pediatrician:] | How do I make that diagnosis? |
| [Prosecutor:] | Yes. |
| [Pediatrician:] | Those are guidelines in child abuse. I mean, that's the State guideline in the State of Florida, if a patient has a credible history, but no medical findings, that |

confirm[ ] the diagnosis of child abuse. If there is an eyewitness account of the abuse, but no medical findings, that confirms the diagnosis of child sexual abuse. If there is a videotape or photographic documentation of the abuse and there are no medical findings, that confirms the diagnosis of child abuse. And those are our guidelines in the State of Florida.

A.R. presented the only eyewitness account of the sexual battery. The prosecution did not introduce into evidence a videotape or a photograph of the sexual battery. Dr. Garby testified that, before the physical examination, he normally speaks with the patient and asks the patient what happened. (Doc. 37-3 at 366) The doctor testified that "[A.R.] was naturally quite embarrassed about the whole episode and somewhat reticent to talk to [him]." (Doc. 37-3 at 367) The jury would have come to the unmistakable conclusion that the pediatrician reached her "diagnosis of child sexual abuse due to a **detailed credible history** of sexual assault with a normal exam" based only on A.R.'s statements. (Doc. 37-3 at 198) (bolding added) *See Geissler v. State*, 90 So. 3d 941, 946–47 (Fla. 2d DCA 2012) ("Even if the expert does not comment directly on the child victim's credibility, expert testimony is improper if the juxtaposition of the questions propounded to the expert gives the jury the clear impression that the expert believed that the child victim was telling the truth.").

When trial counsel asked the pediatrician on cross-examination to explain what a "detailed credible history" meant, the pediatrician directly vouched for the truthfulness of A.R. (Doc. 37-3 at 218–19):

[Trial counsel:]     Then you mentioned that you confirmed this diagnosis of child sexual abuse due to a detailed credible history of sexual assault. I'm going to talk with you a little

bit about what you describe as a detailed credible history. Okay?

So if all you reviewed was Dr. Garby's report and looked at photographs that told you nothing, please tell the members of the jury where in Dr. Garby's medical report is a detailed — is there a detailed and credible history.

[Pediatrician:]  Here's the detailed credible history — I'll read it to you.

[Trial counsel:]  Yeah, I want you to.

[Pediatrician:]  Okay. "Between 1:30 in the morning and 10:00 in the morning, as I understand it, he was staying at a friend's house and one of the male members of that household had him lay on the couch and penetrated him rectally." That is a detailed credible history.

[Trial counsel:]  Why is that credible? Why is that credible?

[Pediatrician:]  Because he told the physician face to face what happened to him.

[Trial counsel:]  So when he told the physician that he was sexually anally penetrated on the couch, you accept that as being credible?

[Pediatrician:]  I do.

[Trial counsel:]  Okay. And so, it's a combination of having no medical findings and the fact that this child is credible in what he related that causes you to arrive at the opinion, in spite of the fact that there's no medical evidence, that this examination and your assessment — reassessment of it or second look at it, that's why you say in your opinion there was anal penetration, correct?

[Pediatrician:]  Yes.

46

The pediatrician's testimony directly vouched for the truthfulness of A.R. by explaining what she meant by "detailed credible history." *Tingle v. State*, 536 So. 2d 202, 205 (Fla. 1988) ("We agree that it was error for the state's witnesses to directly testify as to the truthfulness of the victim . . . ."); *Feller v. State*, 637 So. 2d 911, 915 (Fla. 1994) ("As this Court explained in *Tingle*, 'some expert testimony may be helpful, but putting an impressively qualified expert's stamp of truthfulness on a witness' story goes too far.' This is especially true in this case where the child made inconsistent statements regarding the sexual abuse.") (citations omitted). The trial transcript of the pediatrician's testimony clearly and convincingly rebuts the post-conviction court's finding that the pediatrician did not vouch for the truthfulness of A.R. 28 U.S.C. § 2254(e)(1). The Respondent acknowledges the pediatrician's "unfortunate use of the word 'credible.'" (Doc. 37 at 31)

Because no reasonable jurist would agree with the post-conviction court's determination that the pediatrician did not vouch for the truthfulness of A.R., this Court owes no deference to the post-conviction court's adjudication of the *Strickland* claim and reviews the claim *de novo*. *Cooper v. Sec'y, Dep't Corrs.*, 646 F.3d 1328, 1353 (11th Cir. 2011) ("When a state court unreasonably determines the facts relevant to a claim, 'we do not owe the state court's findings deference under AEDPA,' and we 'apply the pre–AEDPA *de novo* standard of review' to the habeas claim.") (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008)).

However, even under a less deferential *de novo* review, Yarbrough could not demonstrate a reasonable probability that the outcome at trial would have changed if trial counsel had successfully moved to exclude the pediatrician's testimony. *Strickland*, 466 U.S.

at 694. Overwhelming physical evidence corroborated A.R.'s testimony and proved that Yarbrough sexually battered A.R.

Dr. Garby testified that he swabbed the inside A.R.'s anal canal for DNA (Doc. 37-3 at 371–73):

| | |
|---|---|
| [Prosecutor:] | Can you describe for us the procedure that you used to obtain, to use these cotton-tipped applicators to obtain a rectal swab? |
| [Doctor:] | Basically the patient is lying on their stomach. The buttocks are spread and the swab is inserted, or, rather the cotton-tip applicat[or] is inserted into the anal canal one or two inches and then swirled. |
| [Prosecutor:] | So does it go beyond the anal canal into the rectum? |
| [Doctor:] | It could. You know, obviously, it's a blind procedure so you're not going to — you're not able to see actually how far you're going in. |
| [Prosecutor:] | Okay. But those are definitely inserted inside the body rather than used on the outside of the body? |
| [Doctor:] | Correct. |
| . . . | |
| [Prosecutor:] | Now, before you insert the cotton-tipped applicator into the anal canal, rectal area, did you touch the swab to the outside of the body? Did you swab the outside of the body at all? |
| [Doctor:] | No. |
| [Prosecutor:] | And how many swabs did you take? |
| [Doctor:] | Four, I believe. |

| [Prosecutor:] | And who handed you those swabs? |
| [Doctor:] | Deb Flath, the nurse involved. |
| [Prosecutor:] | So were all four of those swabs from the inside of the child's body? |
| [Doctor:] | Yes. |

The nurse testified that, after Dr. Garby swabbed A.R.'s anal canal, the doctor gave her the swabs and she rolled each swab onto a slide. (Doc. 37-3 at 260–66) The nurse further testified that she swabbed the outside area of A.R.'s anus with gauze. (Doc. 37-4 at 252–57)

The prosecution's DNA expert found semen on cuttings from the tan shorts that A.R. wore (Doc. 37-3 at 435, 437–39), found semen on the swabs from within A.R.'s anal canal (Doc. 37-3 at 436–37), and found spermatozoa on the slides that the nurse created from the swabs. (Doc. 37-3 at 437) The expert did not find any semen on the gauze used to swab the outside area of A.R.'s anus. (Doc. 37-3 at 435–36)

The DNA expert testified that Yarbrough's DNA matched ten of the thirteen areas of DNA from one set of swabs of A.R.'s anal canal. (Doc. 37-3 at 440–41, 445) The frequency of occurrence in the general population of Caucasians was one in twenty-four trillion. (Doc. 37-3 at 440–41) Yarbrough's DNA matched thirteen of the thirteen areas of DNA extracted from one of the cuttings from the tan shorts and from the other set of swabs of A.R.'s anal canal. (Doc. 37-3 at 441–46) The frequency of occurrence in the general population of Caucasians was one in sixty-seven quadrillion. (Doc. 37-3 at 441–42, 444)

Because this overwhelming, convincing physical evidence corroborated A.R.'s testimony and proved Yarbrough's guilt, Yarbrough could not demonstrate prejudice under

*Strickland. Richter*, 562 U.S. at 112–13; *Williamson v. Fla. Dep't Corrs.*, 805 F.3d 1009, 1017–18 (11th Cir. 2015).[2]

Ground Five is **DENIED**.


**Ground Six**

Yarbrough asserts that trial counsel was ineffective for not objecting to the admission of out-of-court testimony by the physician who examined A.R. (Doc. 1 at 34–37) He contends that the parties stipulated that the prosecutor would play a videotape of the physician's testimony, and the prosecutor instead asked another prosecutor to read the testimony to the jury. (Doc. 1 at 34) The post-conviction court denied the claim as follows (Doc. 37-5 at 27) (state court record citations omitted):

> [T]he Defendant claims that his counsel was ineffective because he permitted the prosecutor to read into evidence the testimony of the physician. The State perpetuated Dr. Garby's testimony by reading it into evidence at trial. This claim is denied as the record reflects that counsel's conduct was part of a deliberate and tactical strategy. "An unsuccessful strategic decision is not ineffective assistance of counsel if trial counsel considered and rejected alternative courses and that decision was reasonable under prevailing professional standards." *State v. Richardson*, 963 So. 2d 267 (Fla. 2d DCA 2007) (citing *Occhicone v. State*, 768 So.2d 1037, 1048 (Fla. 2000)).

---

[2] In his reply (Doc. 51 at 40), Yarbrough cites *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998), which held that the state court violated the petitioner's federal right to due process by admitting testimony by an expert who vouched for the victim. *Snowden*, 135 F.3d at 737–38, reviewed a federal due process claim, while Yarbrough raises an ineffective assistance of counsel claim. Also, in *Snowden*, 135 F.3d at 738, "[t]he only physical evidence that a child might have been abused by anyone was that one of the children had been treated for an ailment which can be transmitted sexually, but is also transmitted by other means." In this case, Yarbrough's DNA matched DNA on a swab of A.R.'s anal canal.

About two weeks before trial, the prosecutor, trial counsel, and Yarbrough stipulated to the admission of the doctor's perpetuated testimony (Doc. 37-2 at 50):

> The parties hereby stipulate that, due to the unavailability of Dr. Brian Garby during the trial period, Dr. Garby's testimony shall be admitted into evidence through deposition testimony taken on June 22, 2006.

The parties signed the stipulation on the same day as the deposition and did not stipulate that the prosecution would present to the jury a videotape of the testimony. (Doc. 37-2 at 50)

During the deposition, the prosecutor objected to the following question by trial counsel (Doc. 37-2 at 90–91):

| | |
|---|---|
| [Trial counsel:] | Okay. Now, so in other words basically what you're saying is a child this age, say seven or eight years old, who has a normal anus with no abnormalities or injuries, that that anus is consistent with a child being sexually penetrated by an adult male penis, is that what you're saying? |
| [Doctor:] | Certainly possible. |
| [Trial counsel:] | So, in other words, any member on this jury who has a child who has a normal anus who may have been eight or nine, then that person's child — |
| [Prosecutor:] | I'm going to object to that line of questioning. |
| [Trial counsel:] | Okay. Then we'll just go on because the judge will make a ruling and I'll begin my question again. Your objection is noted. I understand. |
| | My question to you is any member of this jury who may have a child who's eight or nine, male or female who has a normal anus with no medical findings, no injuries, |

is a child who could have been or may have been anally penetrated by an adult male penis, is that what you're saying?

[Prosecutor:]          Sure, it's possible.

During trial, the trial court sustained the objection as follows (Doc. 37-3 at 44–46):

[Court:]               I noticed there was an objection on page 40 and I think it was during [trial counsel's] questioning where there was an objection. Let's see.

                       The question by [trial counsel] was: "So, in other words, any member on this jury who has a child who has a normal anus who may have been eight or nine and that person's child" — and then there was an objection and then the witness was allowed to go ahead and answer with that objection having been made. All right. Any argument by either side on that?

[Prosecutor:]          Your Honor, my objection was because I don't think it's proper to — I guess it's not technically the Golden Rule, but it's kind of the Golden Rule. You're asking them to put themselves in that position and even though it's being done to the witness, I just didn't think the form of the question was appropriate.

[Court:]               [Trial counsel,] anything you wanted to say about that?

[Trial counsel:]       No, Judge. I was just trying to make a point. I didn't think I had done anything improper. I don't think the Golden Rule has anything to do with it either, Judge.

[Court:]               I think the way that question was phrased where you were asking the witness to speak about any member of the jury who has a child, I do think that would be improper. So I will sustain that objection. So —

52

| | |
|---|---|
| [Trial counsel:] | Can we take out "the jury" then and "any person with a child"? |
| [Prosecutor:] | I would be all right with that because that's, I mean, that's what he was getting at. |
| [Trial counsel:] | That's really all I was trying to do. |
| [Court:] | Yes, that's fine. . . . |

The parties discussed whether the jury would watch video of the deposition (Doc. 37-3 at 50–54) (bolding added):

| | |
|---|---|
| [Prosecutor:] | And can we just talk about the mode that we're going to present that [testimony] by? We're going to present it by testimony read from the transcript. What I've done in the past, and I don't know how the Court, how the defense feels about this, is just [have] somebody sit up on the stand, I read my questions, whoever sits on the stand could be anybody reading the answers, and then Mr. Watson would play his part as well. |
| [Trial counsel:] | Why can't we just put the tape on? |
| [Prosecutor:] | Because are you going to redact it? |
| [Trial counsel:] | Well, if you want me to. There's not a whole lot there. I think it would be far better that they see the doctor. |
| [Prosecutor:] | If you have time to redact it. I don't have time to redact it. |
| [Trial counsel:] | If you make me a copy, I'll get it redacted. |
| [Prosecutor:] | I think you have the audiotape. I mean, videotape, excuse me. |

[Trial counsel:]      I mean, the idea of videotaping was I think it made a better presentation for the jury to see that.

[Yarbrough:]      Yeah.

[Prosecutor:]      Right, but while Mr. Yarbrough keeps talking, I want to remind Mr. Yarbrough that it's [trial counsel] that needs to do the talking.

Secondly, the rule for a deposition to perpetuate does not provide for video. It provides for the transcript. Although I have no objection to the video being played, the rule provides actually for a transcript to be read. So it's not like I'm going around anything or doing something that I'm not supposed to do. In fact, I'm following the rule as it is. But I have no objection to the video if [trial counsel] wants to take the time to do those redactions, but I literally don't have the time to do it and I'm not going to.

[Court:]      Let me just take a look at the rule. All right, let me just take a look at the rule on perpetuation of testimony.

. . .

[Trial counsel:]      [ ] Judge, the rule that talks about it, by the way, is the pretrial motion, defense's, Rule 3.190.

[Court:]      Okay.

[Trial counsel:]      It's 3.190(j). It's after motion to suppress the confession.

[Court:]      Oh, there it is. Thank you.

[Trial counsel:]      I knew it was in there somewhere. I don't think it speaks to it at all, Judge.

| | |
|---|---|
| [Prosecutor:] | It just talks about it being filed, being taken by an official court reporter, transcribed by the reporter and filed in the trial court. |
| [Trial counsel:] | Right. No, I mean, whether you use a video, number six. |
| [Prosecutor:] | Yes, it says, "used or read," it says. |
| [Court:] | The preferred method would be to have the video actually shown I would think if it can be redacted. I think that would have to be done before it's played because stopping and fast forwarding. And especially the part where we actually changed the words, how are we going to do that with the videotape? |
| [Trial counsel:] | I understand, Judge. At this stage, the reason I wanted the video along with it was for presentation purposes, and although I never discussed that with [the prosecutor], I thought that was sort of implied in what we were doing, which is why we videotaped it. |
| [Prosecutor:] | Well, we didn't — I just want to be clear. We did talk about using the videotape and I mentioned to him the issue about if we had to redact it and I think that because it's the State that normally does that, with all due respect, [trial counsel] probably doesn't understand the process that we go through to do that. |
| [Trial counsel:] | I do. Yeah, I do. |
| [Prosecutor:] | And so it's not like we didn't discuss this at all, but I knew — |
| [Court:] | Well, the portions that have to be removed, I don't see any problem with that. I mean, that can be done if someone takes the time to do that. **Those questions that you asked regarding any member of** |

|  | **the jury that has kids, the only way that could be changed in the video would be to remove them completely.** |
|---|---|
| [Trial counsel:] | **Okay, I'll just agree to take that out then. If I can do that, then clean it up.** |
| [Court:] | If it can be cleaned up according to the rulings that we've had on those objections, I think that would be the preferred way. |
| [Trial counsel:] | All right, judge, I'll try to do that. |

The next day, trial counsel advised that he was unable to redact the videotaped

testimony (Doc. 37-3 at 342):

| [Court:] | Was that videotape redacted? |
|---|---|
| [Trial counsel:] | I had no chance to do it. Yesterday was a day off. I'm not familiar with these little tapes. I don't know anything about the equipment. Nobody was there when I went today. Maybe I'll get lucky tonight. |
| [Court:] | All right. If it cannot be redacted, I gather we'll have to do it using a — |
| [Trial counsel:] | A black marker? |
| [Court:] | Or have someone read the — |
| [Trial counsel:] | Oh, yeah, yeah. Sure. |
| [Court:] | Read his testimony, correct? |
| [Prosecutor:] | Right. |
| [Trial counsel:] | Right. |
| [Court:] | Okay. |
| [Trial counsel:] | I'm going to work real hard to get that done tonight. |
| [Court:] | Okay. |

| | |
|---|---|
| [Trial counsel:] | And I hope the note will work, because — |
| [Prosecutor:] | Judge, my thought was also that if we went ahead and used an actor — and [trial counsel's] office was able to do the redaction at a later time while we're still in trial, then I wouldn't have any problem then presenting the video — |
| [Trial counsel:] | Oh, okay. That's great. |
| [Prosecutor:] | — to come in so that he could have that — I know that he wants that video testimony in. But [trial counsel] and I have been in trial for two weeks and we're both running on steam. And so if he wants to do that, I wouldn't have any objection — |
| [Trial counsel:] | That's great. |
| [Prosecutor:] | — to first let's read it in and we'll go with that. But if he gets that later, I wouldn't have any objection to him putting that in. |
| [Trial counsel:] | Okay. That makes sense. Thank you. |
| [Court:] | Okay. |
| [Trial counsel:] | I'm going to work on it. I'm going to leave some notes. Thank you. |

The next day, trial counsel was still unable to redact the videotaped testimony (Doc.

37-3 at 350):

| | |
|---|---|
| [Court:] | . . . I think when we adjourned yesterday, we were talking about the transcript of the tape. All right. Do we have a redacted tape or we don't? |
| [Prosecutor:] | No, not yet. But I think we need to do a read-in of the testimony. [Trial counsel] and I were just talking about getting someone to — you know, to help us with |

|  |  |
|---|---|
|  | that. I got to look and see if I have two copies of the transcript. |
| [Court:] | Well, I have the one that you all gave me — |
| [Prosecutor:] | Okay. |
| [Court:] | — the other day. |
| [Prosecutor:] | We're going to see if we can get Mr. Yuter to maybe just sit on the stand and do some reading. |

Before the prosecutor presented the doctor's testimony, the trial judge read to the jury the following instruction (Doc. 37-3 at 358–59):

|  |  |
|---|---|
| [Court:] | The State has told me that their next witness is Dr. Brian Garby. Dr. Garby knew in advance that he would not be available to present live testimony in court this week because he was out of the country and informed both attorneys of that. Both attorneys agreed to take his testimony in advance of the trial. It was done in a courtroom. The defendant was present. [The prosecutor and trial counsel] were there. And they went ahead and actually conducted his trial testimony a week or two ago for use at trial. The way that is going to be presented to you is as follows: |
|  | The attorneys will be asking the questions and answers that are on the — will be asking the questions and Dr. Garby will be providing the answers in the form of a transcript, and it will be read to you in this courtroom. We have a local attorney, Dan Yuter, who is going to be reading the testimony of Dr. Garby as it was presented in the transcript. |
|  | So just as means of explanation, [the prosecutor] will be asking the questions |

> that she asked of Dr. Garby. Mr. Yuter
> will be reading Dr. Garby's responses.
> [Trial counsel] will be asking the questions
> that he asked of Dr. Garby, and Mr. Yuter
> will be providing those responses from Dr.
> Garby. So that's the way it's going to be
> presented to you. I wanted to explain that
> to you so you would understand.

Trial counsel did not present a redacted videotape of the doctor's testimony during the defense's case-in-chief.

The trial court explained to trial counsel that, to comply with the ruling sustaining the objection to the perpetuated testimony concerning "any member of this jury who may have a child who's eight or nine," trial counsel would have to redact the question and answer from the videotape. (Doc. 37-3 at 53) By instead agreeing to present the testimony without the videotape, the jury heard the edited question and answer (Doc. 37-3 at 396):

> [Trial counsel:]  My question to you is, any child who's
> eight or nine, male or female, who has a
> normal anus with no medical findings, no
> injuries, is a child who could have been or
> may have been anally penetrated by an
> adult penis, is that what you're saying?
>
> [Doctor:]  Sure, it's possible.

This question and answer had the potential to significantly undercut the doctor's credibility and may have had the effect of bolstering Yarbrough's defense. Because Yarbrough failed to demonstrate that no reasonable counsel would have forgone the presentation of the videotaped testimony when it became clear that the video could not be completely redacted, the post-conviction court did not unreasonably deny the claim. *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a

petitioner must establish that no competent counsel would have taken the action that his counsel did take."); *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) ("Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so.").

Even if trial counsel deficiently performed, Yarbrough could not demonstrate prejudice under *Strickland*. The trial court did not inform the jury that the attorney who read the doctor's testimony was a prosecutor. The trial court described the attorney as a "local attorney." (Doc. 37-3 at 358) Also, because overwhelming, compelling DNA evidence corroborated A.R.'s testimony and proved Yarbrough's guilt, Yarbrough could not demonstrate a reasonable probability that the outcome would have changed if trial counsel had insisted that the jury view the videotape of the doctor's testimony. *Khan v. United States*, 928 F.3d 1264, 1279–80 (11th Cir. 2019) (citing *Bates v. Sec'y, Fla. Dep't Corrs.*, 768 F.3d 1278, 1300 & n.9 (11th Cir. 2014)).

Ground Six is **DENIED**.

**Ground Seven**

Yarbrough asserts that trial counsel was ineffective for not impeaching A.R. at trial with a prior inconsistent statement. (Doc. 1 at 38–41) At trial, A.R. denied that he went inside Yarbrough's home with his father the morning after the crime to confront Yarbrough. (Doc. 1 at 38) Yarbrough contends that A.R. contradicted himself by telling a member of the child protection team that he did go inside with this father to confront Yarbrough. (Doc. 1 at 38)

The post-conviction court denied the claim as follows (Doc. 37-5 at 287) (state court record citations omitted):

> [T]he Defendant contends that his trial counsel was ineffective for failing to impeach the child victim with a previous inconsistent statement made to a representative of Child Protective Services. The subject of the inconsistency was whether the victim accompanied his father the morning after he was sexually battered when his father confronted the Defendant inside the Defendant's home.
>
> As the State catalogues in its written response, defense counsel impeached the child victim during trial seventeen times with prior inconsistent statements, changes in in-court testimony, or speculation. Thus, defense counsel presented the jury with ample cause to question the weight of the victim's in-court testimony. On this record, the Court finds that the Defendant was not prejudiced by his counsel's failure to present an eighteenth example of a conflict in the victim's testimony. [The claim] is denied.

On direct examination, A.R. testified that, in the morning, he told his father about the sexual battery, his father went inside Yarbrough's home, and A.R. did not know what happened inside because A.R. stayed outside. (Doc. 37-3 at 77–78)

On cross-examination of a detective who watched an interview of A.R. by the child protection team, trial counsel attempted to impeach A.R. (Doc. 37-3 at 323–25):

| [Trial counsel:] | Okay. Did he talk in that interview at all about [Yarbrough] being confronted with this accusation that he was making? |
| [Detective:] | Yes, he did. |
| [Prosecutor:] | Your Honor, I'm going to object to this line of impeachment unless — |
| [Court:] | Sustained. |
| [Trial counsel:] | From that interview, did you ever get the impression that when the father |

|                  | confronted [Yarbrough] that [A.R.] was in the house with him? |
|------------------|------------------------------------------------------------|
| [Prosecutor:]    | Objection, Your Honor.                                      |
| [Court:]         | Sustained.                                                 |
| [Trial counsel:] | Judge, I'm — [A.R.] said that —                            |
| [Court:]         | Approach the bench.                                         |
| (Bench conference.) |                                                         |
| [Court:]         | Yes, sir, go ahead.                                         |
| [Trial counsel:] | Judge, when I asked [A.R.] — well, not just me, but the State also — when we asked him, after he told his father what happened, he said his father confronted — went in the house and he stayed in the car and that the father confronted [Yarbrough]. But in the child protection team interview he said that he went in, too, because they had [Yarbrough] in tears. That's what he says in the — in the interview. So, I just want to bring out the fact that he did, indeed, go in the house and not stay in the car like he said. |
| [Prosecutor:]    | Your Honor, I believe that the proper mode of impeachment is to first confront the witness. |
| [Court:]         | Right, if you're trying to impeach, you have to first ask the witness, "Did you tell them at the child protection team interview A, B or C?" If he says he doesn't remember, then you can bring in through the evidence the fact that he said A, B or C in that interview. You can't just ask the witness, "What did the person say at the child protection team interview," when the witness did not have an opportunity to explain that in his direct or cross-examination. |

| [Trial counsel:] | Judge, I asked him, "Did you go in the house?" He said, "No, I stayed in the car." |
|---|---|
| [Court:] | Right, but then — |
| [Trial counsel:] | So he denied going in the house. |
| [Court:] | But right now — right now, what you have to ask him is, "Did you ever tell someone something else different?" And then you impeach that way. |
| [Trial counsel:] | I don't think that's right, Judge. |
| [Court:] | Can you show me where — |
| [Trial counsel:] | He made the statement. He made an inconsistent statement. |
| [Court:] | But you have to first — |
| [Trial counsel:] | I understand the Court's ruling. |

The trial judge offered trial counsel an opportunity to proffer testimony by the detective concerning the inconsistent statement, but trial counsel declined. (Doc. 37-3 at 342)

Under Florida law, "[e]xtrinsic evidence of a prior inconsistent statement by a witness is inadmissible unless the witness is first afforded an opportunity to explain or deny the prior statement and the opposing party is afforded an opportunity to interrogate the witness on it, or the interests of justice otherwise require." § 90.614(2), Fla. Stat. Also, "[t]he theory of admissibility [of a prior inconsistent statement] is not that the prior statement is true and the in-court testimony is false, but that because the witness has not told the truth in one of the statements, the jury should disbelieve both statements." *Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004).

The post-conviction court did not unreasonably determine that trial counsel showed that A.R. frequently contradicted himself when he testified at trial. On direct examination,

A.R. testified that, after getting breakfast at a convenience store and speaking with a police officer, he and his father went to their old apartment where his father used a computer. (Doc. 37-3 at 78–79) On cross-examination, A.R. admitted that the electricity was shut off in the apartment because his father had not paid the bill, and A.R. could not explain how his father used the computer without electricity. (Doc. 37-3 at 98–100) On cross-examination, A.R. testified that Yarbrough's grandmother always slept with her bedroom door shut but also agreed that she sometimes slept with her door open. (Doc. 37-3 at 110–11) A.R. testified that he never slept in the chair in the living room but also agreed that he fell asleep in the chair on the night of the sexual battery. (Doc. 37-3 at 114) He also agreed that he had contradicted himself by telling a member of the child protection team that he had instead fallen asleep on the couch that night. (Doc. 37-3 at 139) A.R. testified that his father never left him and his sister at Yarbrough's home at night but also agreed that his father sometimes would leave at night. (Doc. 37-3 at 116) A.R. testified that he woke up when he felt someone pick him up while he was asleep on the couch but also testified that he first woke up in Yarbrough's bed. (Doc. 37-3 at 142–43)

Also, the post-conviction court did not unreasonably determine that trial counsel thoroughly impeached A.R. with his deposition testimony. At trial, A.R. testified that he did not know if his father and Yarbrough fought about money the night before the sexual battery. (Doc. 37-3 at 120–21) When confronted with his deposition testimony, A.R. agreed that he had testified that his father and Yarbrough did fight about money that night. (Doc. 37-3 at 122–23) A.R. testified that, the night before the sexual battery, he went inside Yarbrough's home to watch television, fell asleep for ten minutes, and denied knowing where his father went. (Doc. 37-3 at 131–32) When confronted with his deposition

testimony, A.R. agreed that he had testified that his father had left for two hours. (Doc. 37-3 at 133–34) A.R. denied that Yarbrough kicked him and his father out of the home that night. (Doc. 37-3 at 140) When confronted with his deposition testimony, A.R. agreed that he had testified that Yarbrough "chased" his father out of the home. (Doc. 37-3 at 140–41)

At trial, A.R. testified that he was asleep when Yarbrough started to sexually batter him but woke up before Yarbrough stopped. (Doc. 37-3 at 75) When confronted with his deposition, A.R. agreed that he had testified that, when he woke up, Yarbrough was pulling up his pants and went to the kitchen to prepare breakfast. (Doc. 37-3 at 165) A.R. testified that he wore tan shorts during the sexual battery. (Doc. 37-3 at 71) When confronted with his deposition testimony, A.R. agreed that he had testified that he wore black shorts. (Doc. 37-3 at 152) A.R. testified that the tan shorts belonged to Yarbrough. (Doc. 37-3 at 71) When confronted with his deposition testimony, A.R. agreed that he had testified that the tan shorts belonged to him. (Doc. 37-3 at 149) A.R. testified that, after the sexual battery, he took off the tan shorts in the car with his father. (Doc. 37-3 at 81–82) When confronted with his deposition testimony, A.R. agreed that he had testified that he took off the black shorts in the car and took off the tan shorts at the hospital. (Doc. 37-3 at 151, 155–56)

The additional impeachment about A.R.'s presence when his father confronted Yarbrough was cumulative to trial counsel's exhaustive and thorough impeachment of A.R. on other more critical matters. Whether A.R. was inside the home or outside the home when his father confronted Yarbrough about the sexual abuse was not critical to the prosecution's case or Yarbrough's defense. Even if trial counsel had further discredited A.R. with the additional impeachment, overwhelming, convincing DNA evidence corroborated A.R.'s testimony and proved Yarbrough's guilt. Yarbrough could not demonstrate prejudice

under *Strickland*, and the post-conviction court did not unreasonably deny the claim. *Insignares v. Sec'y, Fla. Dep't Corrs.*, 755 F.3d 1273, 1283 (11th Cir. 2014). *Fugate v. Head*, 261 F.3d 1206, 1219–21 (11th Cir. 2001).

Ground Seven is **DENIED**.

Accordingly, it is **ORDERED** that Yarbrough's petition (Doc. 1) is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Yarbrough and **CLOSE** this case.

## DENIAL OF CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Yarbrough neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on September 23, 2022.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE